IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 16-cv-00304-MSK-MJW

**ASHLEY DROLLINGER, individually and on behalf of similarly situated persons,**

    **Plaintiff,**

v.

**NETWORK GLOBAL LOGISTICS, LLC;
ACTION COURIERS, INC.; and
MEDICAL LOGISTIC SOLUTIONS, LLC,**

    **Defendants.**

---

### OPINION AND ORDER OVERRULING OBJECTIONS AND AFFIRMING MAGISTRATE JUDGE ORDERS

---

    **THIS MATTER** comes before the Court pursuant to the Defendants' Objection **(# 168)** to the Magistrate Judge's January 8, 20128 Order **(# 161)**, and the Plaintiffs' response **(# 173)**; the Defendants' Objection **(# 175)** to the Magistrate Judge's January 17, 2018 Order **(# 166)**, the Plaintiffs' response **(# 182, 184)**, and the Defendants' reply **(# 189)**.

    In this case, Mr. Drollinger and a group of opt-in Plaintiffs are "medical couriers who used their own automobiles to deliver laboratory specimens, organs, blood, pharmaceuticals, patient records, and other medical goods" under the employ of the Defendants. The Plaintiffs allege that, because the Defendants "fail to reimburse [employees] for the cost of the business use of their vehicles, . . . the medical couriers' net wages [ ] fall below" the minimum wage set by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*[1] The Court authorized the

---

[1]     The Complaint also asserts similar claims under the Montana Minimum Wage and Overtime Compensation Act, Mont. Code § 39-3-401 *et seq.*, apparently on behalf of all

1

Plaintiffs to pursue this matter as an FLSA collective action, and at present, some 135 couriers have opted into the litigation.

**Discovery Dispute**

On October 4, 2017, the Plaintiffs moved **(# 140)** for a protective order in response to interrogatories and document requests to all 135 Plaintiffs. The Plaintiffs argued that the requests were overbroad, sought irrelevant material, and were unduly burdensome. This Court referred the motion to the Magistrate Judge and on January 8, 2018, the Magistrate Judge granted **(# 161)** the Plaintiffs' motion. Specifically, the Magistrate Judge found that the breadth of the Defendants' requested discovery "bears no proportionality to the value of the claims in this case" and that allowing extensive discovery directed to each Plaintiff would "defeat the purpose of allowing employees to bring collective actions under the FLSA." Instead of allowing full discovery from each Plaintiff, the Magistrate Judge determined that a more streamlined approach was necessary, directing that the parties develop a "sworn questionnaire . . . straightforward enough that it can be responded to without the assistance of counsel" that could be sent to and completed by each individual Plaintiff. Thereafter, if the questionnaire responses "identify additional opt-in Plaintiffs from whom [the Defendants] determine they need further written discovery," the Defendants could seek such discovery.[2]

The Defendants filed timely Objections **(# 168)** to the Magistrate Judge's Order. The Defendants argue that the Magistrate Judge's instructions "preclude[ ] Defendants from utilizing any of the discovery vehicles under the Federal Rules to assess and test" the Plaintiffs' assertion,

---

Plaintiffs regardless of their work locations. The presence of that state-law claim does not affect the analysis herein.

[2] The Magistrate Judge also preemptively quashed the Defendants' plan to notice each of the 135 Plaintiffs for depositions, but left open the possibility that the Defendants might be permitted to depose more than the 30 Plaintiffs they have already deposed.

and that it "completely eliminates cross examination or any other method of validation." The Defendants' particular arguments are: (i) the Magistrate Judge erred in not assessing "the importance of the issues at stake in the litigation" before deciding to limit the Defendants' resort to discovery tools; and (ii) the Magistrate Judge erred in requiring the Defendants to resort to "intermediate" discovery measures despite the fact that each Plaintiff here is treated as a full-fledged party, as doing so deprives the Defendants of the ability to test each Plaintiff's claim.

The Court reviews the Magistrate Judge's Order pursuant to Fed. R. Civ. P. 72(a) to determine whether it is "clearly erroneous or contrary to law." The Court must affirm the Magistrate Judge's ruling unless, having examined the entire record, it is "left with the definite and firm conviction that a mistake has been committed." *Allen v. Sybase, Inc.*, 468 F.3d 642, 658 (10th Cir. 2006).

Having reviewed the Defendants' Objections and the Magistrate Judge's Order, the Court cannot say that the Magistrate Judge erred. Although discovery should not be narrowly circumscribed, the desire to afford broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant. *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1368 (10th Cir. 1997). The Magistrate Judge's conclusion that the Plaintiffs' concerns of cost and expediency were more important here than the Defendants' concerns of comprehensiveness and certainty was a legitimate place to strike that balance. The Court is particularly persuaded by the fact that although the Magistrate Judge required the Defendant to <u>initially</u> conduct discovery from the Plaintiffs through sworn responses on questionnaires, the Magistrate Judge left open the possibility that those questionnaires could reveal situations in which <u>follow-up</u> discovery on a focused, individual basis might be warranted.

Although the Defendants are correct that FLSA collective actions are, at bottom,

3

collections of what are effectively single-plaintiff claims, that fact does not entitle the Defendants to discovery equivalent to that which would occur in 135 separate single-plaintiff lawsuits. The FLSA collective action process is designed to give "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources" and to give courts "benefits by the efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Such advantages are, of course, gained at a cost, and here, the cost is visited upon employers like the Defendants, who would typically prefer costly and comprehensive procedures to inexpensive and efficient ones. But that is a decision that has already been made by Congress. Here, the Magistrate Judge correctly identified the Congressional priorities, *Docket* # 161 at 4 (identifying "efficient resolution" as "the purpose of allowing employees to bring collective actions"), and correctly discerned that the costs of individual-plaintiff discovery could be avoided, without undue unfairness, by resorting to broader and more informal discovery tools. In a case with as many Plaintiffs as this one, it would not be at all surprising that large groups of Plaintiffs will have largely similar sets of vehicle expenses – many are likely to drive vehicles that get the same or similar gas mileage, cost the same or similar amounts to insure, or have similar maintenance and repair histories – such that their expenses can be reasonably aggregated across a large group, ameliorating the need for individual discovery. Imposing such a mechanism upon the Defendants, at least as an initial screening tool, effectuates the Congressional purposes behind the FLSA collective action and constitutes an appropriate balancing of the relative interests of the parties.

Thus, because the Court finds that the Magistrate Judge did not err, the Court overrules the Defendants' Objections and affirms the Magistrate Judge's ruling.

4

**Sanctions Dispute**

Independently of this lawsuit, the U.S. Department of Labor ("DOL") commenced an audit of the Defendants wage and hour records under a different statute, the Service Contract Act ("SCA"). The DOL concluded that the Defendants had not made all of the wage payments required by the SCA, and directed the Defendants to make payments to employees as a remedy. In September 2017, the Defendants sent letters directly to the affected employees, notifying them that "it was determined that you are owed additional payment for services provided during your employment," enclosing a check, and including a "receipt" form that was drafted by the DOL.

The receipt form requires some explanation. It referred to the payment of wages "based on the findings of a [Department of Labor] investigation" and was "required by the Act(s) indicated below." Immediately below that sentence is a checked box identifying the "Service Contract Act. After several additional paragraphs of information, the form concluded with a space for the employee's signature, plus waiver language which read "I understand that my signature on this receipt and waive attests to the fact that I have actually received the payment indicated above . . . and that I waive my right to bring suit as described above and covering the period set forth above."

Upon learning of such communications between the Defendants and Plaintiffs, the Plaintiffs' counsel became concerned for several reasons. Most significantly, the Plaintiffs' counsel was concerned about the waiver language and the effects, both actual and perceived, it might have on the Plaintiffs. The Plaintiffs' counsel e-mailed the Defendants' counsel, requesting that the Defendants confirm that they "will not seek to rely on the payments currently offered [under the Service Contract Act] as a defense to any liability in our law suit, either based on waiver, accord and satisfaction, or any other defense." The Defendants' counsel responded

that they "do not understand your concern," state that "the forms are government forms that . . . have not been altered" by the Defendants, and that "the waiver, drafted by the government, says what it says." Specifically responding to the Plaintiffs' concern that the waiver language might be used in this action, the Defendants' counsel responded "To the extent that [Plaintiffs] performed non-SCA work in a different pay period and claims that [the Defendants] failed to pay them the minimum wage, then the waiver would have not effect on such a claim." After additional discussions with the DOL, counsel for the Plaintiffs again wrote to the Defendants, asking them to "confirm that you are now taking the position that those [forms] . . . waive only SCA claims and do not waive any claims asserted in our law suit." The Defendants responded that "whether the waivers release FLSA claims beyond the SCA work is a legal issue that [the Defendants are] not conceding."

The Plaintiffs then filed a Motion for Protective Order **(# 142)**, requesting: (i) "a declaration that [the waivers] do not impact any of [the Plaintiffs'] rights in this litigation and do not waive any claims asserted herein"; (ii) an order restricting the Defendants from having further *ex parte* communications with the Plaintiffs; (iii) the authorization of a notice to the Plaintiffs "to inform them that they may execute [the waivers] without waiving any claims asserted in this litigation; and (iv) sanctions in the form of the costs and fees incurred by the Plaintiffs in bringing the motion. This Court referred the Plaintiffs' motion to the Magistrate Judge. On January 17, 2018, the Magistrate Judge granted in part and denied in part **(# 166)** the Plaintiffs' motion. Specifically, the Magistrate Judge found: (i) it was not necessary to determine whether the waivers affected the Plaintiffs' FLSA claims because "Defendants and Plaintiffs all understand that no opt-in Plaintiff waived any FLSA claims by accepting an SCA settlement"; (ii) that the Defendants' direct communications with the represented Plaintiffs was

6

not necessarily improper, but; (iii) the communications that the Defendants had with the Plaintiffs – both the contents of the DOL forms and communications by the Defendants' Human Resources Department to the Plaintiffs – were "confusing for the recipients" and "so misleading as to be improper"; (iv) that such confusion would be ameliorated by directing the Defendants to send a copy of the Magistrate Judge's Order to every opt-in Plaintiff; and (v) that "because the instant motion [was] only necessitated by Defendants' game-playing" over whether the DOL waiver would apply to the instant FLSA claims as well, "the Court will award Plaintiffs all reasonable and necessary attorney's fees and costs incurred in bringing this motion."

The Defendants filed timely Objections **(# 175)** to the Magistrate Judge's Order, arguing that "the factual findings in the Magistrate's Order do not support an award of attorney fees." The Defendants argue that the communication about the DOL payments was not *ex parte* because it did not concern matters in <u>this</u> lawsuit; that "vagueness" in communications is not grounds for sanctions; that the communications with the Plaintiffs did not "misle[a]d anyone into any action" beyond simply accepting the check; and that the Defendants' counsel properly responded to the requests from the Plaintiffs' counsel to state the Defendants' position on the scope of the waiver – that they "would not and do not take the position that the government form waived minimum wage claims independent of the SCA work that the employee performed." Thus, the Defendants contend that the Magistrate Judge's decision to award sanctions was clearly erroneous or contrary to law.

This Court begins its analysis with the observation that the Magistrate Judge's Order does not identify either the target of the attorney fee sanction – that is, whether the sanction is imposed against the Defendants or their counsel (or both) – nor the legal source for that sanction. Both omissions make it somewhat difficult for this Court to review the matter. The Court will

7

assume that the sanction is imposed on the Defendants' counsel, insofar as the Magistrate Judge keyed the sanction to "game-playing" by counsel in responding to the Plaintiffs' counsel's request for the Defendants' position on the effectiveness of the waiver. The Court also assumes that the Magistrate Judge was basing the sanction on either 28 U.S.C. § 1927 or the court's "inherent powers."[3]

28 U.S.C. § 1927 provides that "any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney' fees reasonably incurred because of such conduct." Section 1927 articulates an "extreme standard" that should be awarded "only in instances evidencing a serious and standard disregard for the orderly process of justice." *Baca v. Berry*, 806 F.3d 1262, 1268 (10th Cir. 2015). A showing of subjective bad faith by the target of the sanction is not necessary, but the court must find that the sanctioned attorney "manifest[ed] either intentional or reckless disregard of the attorney's duties to the court." *Hamilton v. Boise Cascade Express*, 519 F.3d 1197, 1202 (10th Cir. 2008).

Relatedly, the Court possesses "inherent authority" to assess attorney fees against a party or attorney who has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991). The purpose of such sanctions are to "vindicat[e] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[e] the prevailing party whole for expenses caused by his opponent's obstinancy. *Id.* at 46. The Supreme Court suggests, however, that "the court ordinarily should rely on the Rules rather than the inherent power. *Id.*

---

[3] The circumstances presented herein do not clearly fall within any of the particular subsections of Fed. R. Civ. P. 37, and communications between counsel do not constitute filing papers with the Court for purposes of Fed. R. Civ. P. 11(b).

8

Thus, this Court will proceed to consider whether the Magistrate Judge's sanction is permissible under 28 U.S.C. § 1927. In this regard, the Court is guided significantly by *Hamilton*. There, the parties reached a settlement and entered into a settlement agreement that contained terms requiring: (i) the plaintiffs to execute a stipulation of dismissal; (ii) the defendant to pay the agreed-upon settlement amount upon execution of that stipulation; and (iii) the plaintiffs to return certain documents that belonged to the defendant. The plaintiffs' counsel became convinced that the defendant's counsel was conditioning payment of the settlement amount (ii) on the return of the documents (iii), and the defendant's counsel endeavored to correct that misunderstanding and make clear that the defendant was withholding payment (ii) because the plaintiffs had yet to execute the stipulation of dismissal (i). "For nearly a month," the parties "traded letters and emails in which the plaintiffs sought payment . . .and [the defendant] insisted, pursuant to the agreement, on the filing of [their] stipulation of dismissal before they would do so." Eventually, both sides cross-moved to enforce the settlement agreement, and the defendant sought sanctions against the plaintiffs' counsel. The trial court found that the plaintiff's counsel had no reasonable person would have understood the defendant's counsel's communications in the way that the plaintiffs' counsel interpreted them, and that, by virtue of his unreasonable misunderstanding, the plaintiffs' counsel "had multiplied the proceedings unreasonably, vexatiously, and recklessly" under 28 U.S.C. § 1927.

On appeal, the 10th Circuit affirmed, finding that the dispute "grew out of a long and vituperative series of communications in which [the plaintiffs' counsel] repeatedly too positions in diametric opposition to the express terms of the settlement agreement." The 10th Circuit conceded that the plaintiffs' counsel's conduct was not "among the most striking or egregious to reach our Court, [but that] sanctions are not reserved for the worst offenders." It noted that

sanctions under § 1927 are "levied to compensate the victims of dilatory practices, not as a means of punishment," and thus, "a protracted course of vexatious conduct is unnecessary." It reassured attorneys that "the mere imposition of a sanction under this section does not, without more, necessarily reflect on the moral character of the offender" and that sanctions were appropriate even where counsel acted with a "pure heart" but an "empty head." 519 F.3d at 1202-03.

This situation is similar. The Plaintiffs' counsel's September 26, 2017 e-mail to defense counsel made a seemingly simple request: that the Defendants affirm that they "will not seek to rely on the payments . . . as a defense to liability in our law suit, either based on waiver, accord and satisfaction or any other defense." The Defendants' response was somewhat oblique and non-responsive, suggesting that the tendered waiver would have no effect on Plaintiffs who "performed non-SCA work <u>in a different pay period</u>." (Emphasis added.) A few days later, the Plaintiffs' counsel again wrote to defense counsel, stating that the Plaintiffs had been informed by the DOL that the DOL and Defendants had specifically discussed and agreed that the tendered waives "waive only SEC claims and do not waive any claims asserted in our law suit." The Plaintiffs requested a simple assurance from the Defendants that the tendered waivers "waive only SCA claims and do not waive any claims asserted in our law suit." The Defendants again refused to take a position, stating that "whether the waivers release FLSA claims beyond the SCA work is a legal issue that [the Defendants] are not conceding." The Defendants' non-answer prompted the Plaintiffs to promptly file the Motion for Protective Order. Later, the Plaintiffs supplemented their pending motion with an affidavit from a DOL District Director, who stated that: (i) the DOL's investigation actually involved <u>both</u> SCA and FLSA concerns; (ii) the DOL was aware of the instant lawsuit during the SCA audit, that the DOL purposefully

"excluded any recovery under the FLSA for individuals who opted into [this] lawsuit to preserve their private right of action"; and (iii) that DOL counsel "specifically explained to [the Defendants' representatives and corporate counsel] that [the DOL's] settlement with [the Defendants] did not resolve any FLSA claims against those companies with respect to individuals who opted into [this] lawsuit" and that the Defendants and their attorney "acknowledged the [DOL's] explanation."

The Magistrate Judge made two findings of import to this analysis: (i) that the Defendants "understand that no opt-in Plaintiff waived any FLSA claims by accepting an SCA settlement," and (ii) that the Defendants' statements of their positions in response to the Plaintiffs' requests constituted "game-playing," suggesting that the Magistrate Judge believed that the Defendants acted intentionally to frustrate the Plaintiffs and induce them to file a motion seeking to clarify the issue. The Court does not understand the Defendants' Objections to challenge either of these findings; even if they did, the findings are consistent with the evidence. With these findings in place, the Magistrate Judge's finding that the Defendants should be sanctioned under 28 U.S.C. § 1927 was within the range of the Magistrate Judge's discretion. The Plaintiffs clearly asked the Defendants to affirm that they did not contend that the SCA payments would act as a waiver of any Plaintiffs' FLSA claims, and the Defendants refused to clearly do so. By finding that this is indeed the Defendants' position, yet the Defendants acted intentionally to avoid stating as much,[4] the Magistrate Judge properly found that the Defendants'

---

[4] This Court suspects that the Defendants were intending to leave open the possibility that they might eventually argue that, regardless of why they were made, the SCA payments could act to offset any FLSA liability the Defendants have to the Plaintiffs. To the extent this was the case, the Defendants' failure to state as much, instead offering only the oblique assertion that a "legal issue" prevented them from agreeing that waver was not at issue, is just as vexatious. The Court depends on attorneys to be candid and forthcoming in their pre-motion communications, and an attorney's decision to conceal their actual positions behind vague or non-responsive

11

counsel acted vexatiously. As in *Hamilton*, it is not necessary for this Court to find that the Defendants' counsel acted in actual bad faith, egregiously, protractedly, or even that counsel are of bad moral or professional character; it is sufficient to find that they acted unreasonably and that such unreasonable conduct required the Plaintiffs to expend resources to resolve the matter. The facts, as found by the Magistrate Judge, permit the conclusion that the Defendants' counsel's actions met that standard.

Accordingly, the Court **OVERRULES** the Defendants' Objections **(# 168, 175)** and **AFFIRMS** the Magistrate Judge's Orders **(# 161, 166)**.

Dated this 9th day of March, 2018.

**BY THE COURT:**

_____

Marcia S. Krieger
Chief United States District Judge

---

denials only serves to needlessly promote unnecessary motion practice, exactly what § 1927 was intended to discourage.